IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANICE PRIMER o/b/o Z.P. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, Commissioner of Social Security[1] | : | NO. 18-5383 |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                                 February 5, 2020

Janice Primer, on behalf of her minor grandson Z.P. ("Plaintiff"),[2] seeks review of the Commissioner's decision denying his claim for supplemental security income ("SSI"). For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") denying benefits is not supported by substantial evidence and will remand the case for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**I.    PROCEDURAL HISTORY**

Plaintiff protectively filed for SSI on July 22, 2013, alleging an onset date of April 27, 2011, the date of Plaintiff's birth. Tr. at 153, 163, 301. The application was denied, id. 189-92, and Plaintiff requested an administrative hearing before an ALJ, id. at 193,

---

[1]Andrew Saul became the Commissioner of Social Security ("Commissioner") on June 17, 2019, and should be substituted for the former Acting Commissioner, Nancy Berryhill, as the defendant in this action. Fed. R. Civ. P. 25(d).

[2]Ms. Primer testified that she is Plaintiff's maternal grandmother and has had custody of him since his birth. Tr. at 116. The record contains a guardianship agreement dated October 1, 2012. Id. at 300.

which took place on June 17, 2015.  Id. at 145-52.[3]  On July 13, 2015, the ALJ issued an unfavorable decision.  Id. at 167-81.  On January 10, 2017, the Appeals Council granted Plaintiff's request for review based on new and material evidence indicating that Plaintiff's impairments may have been more severe than found by the ALJ.  Id. at 187-88.

At a second administrative hearing, held on May 25, 2017, Plaintiff, his grandmother, and a medical expert testified.  Tr. at 105-44.[4]  On October 17, 2017, the same ALJ again found that Plaintiff was not disabled.  Id. at 81-98.  The Appeals Council denied Plaintiff's request for review on November 5, 2018, id. at 1-3, making the ALJ's October 17, 2017 decision the final decision of the Commissioner.  20 C.F.R. § 416.1472.

Plaintiff commenced this action on December 12, 2018.  Doc. 1.  The matter is now fully briefed and ripe for review.  Docs. 11, 16-17.[5]

## II. LEGAL STANDARDS

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); see Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that

---

[3]At this hearing, Plaintiff was not represented by counsel, tr. at 147, and only Ms. Primer, Plaintiff's grandmother, testified.

[4]At the second administrative hearing, Plaintiff was represented by counsel.

[5]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Doc. 4.

Plaintiff is not disabled. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014) (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). The court has plenary review of legal issues. Schaudeck, 181 F.3d at 431.

To determine eligibility for child benefits, the Commissioner employs a three-step sequential evaluation that examines (1) whether the minor has engaged in substantial activity, (2) whether he or she had a medically determinable severe impairment(s), and (3) whether the impairment(s) met, medically equaled, or functionally equaled the Listings of Impairments. 20 C.F.R. § 416.924(a).[6] The claimant bears the burden at each step. Id. § 416.912(a).

The last step is further broken down into two alternative steps. First, in determining whether the impairment(s) met or medically equaled a Listing, there must be medical findings that met or equaled in severity all of the criteria for the Listing. See Sullivan v. Zebley, 493 U.S. 521, 531 (1990). Second, in determining whether the impairment(s) functionally equaled a Listing, the ALJ must assess the claimant's functioning in six domains; (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(b). To functionally equal a Listing, the claimant's impairment or

---

[6]All citations to the relevant C.F.R. provisions and the Listings are to the versions in effect at the time of the ALJ's second decision.

combination of impairments must result in "marked" limitations in two of these domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d). Social Security regulations define a "marked" limitation in a domain as one that interferes "seriously" with Plaintiff's ability to independently initiate, sustain or complete activities, and as equivalent to "the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations from the mean." Id. § 416.926a(e)(2). An "extreme" limitation is one that interferes "very seriously" with Plaintiff's ability to independently initiate, sustain, or complete activities, and is equivalent to at least three standard deviations below the mean on standardized testing. Id. § 416.926a(e)(3).

## III. DISCUSSION

### A. ALJ's Findings and Plaintiff's Claims[7]

The ALJ found that Plaintiff suffered from two severe impairments: attention deficit hyperactivity disorder ("ADHD") and autism spectrum disorder ("ASD"). Tr. at 84. The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the Listings, id. at 85, and that Plaintiff did not have a combination of impairments that functionally equaled the severity of the

---

[7]In the Disability Report completed by Plaintiff's grandmother at the time of the application when Plaintiff was a little over two years old, she indicated that his problems included asthma for which he had frequent hospitalizations, speech and language delays, difficulty eating, and inability to identify objects in books. Tr. at 374. By the time of the second hearing when he was six years old, Plaintiff claimed additional disabling conditions.

4

Listings.  Id.  Specifically, the ALJ found that Plaintiff had less than marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, caring for himself, and health and physical well-being, and no limitation in the domain of moving about and manipulating objects.  Id. at 91-97.

Plaintiff claims that the ALJ (1) failed to find his pervasive development disorder ("PDD"), oppositional defiant disorder ("ODD"), speech delays, and cognitive difficulties to be severe impairments, (2) erred in the concluding that he did not meet or equal a Listing, and (3) improperly considered the testimony offered by the medical expert.  Doc. 11.  Defendant responds that the ALJ properly determined that the additional impairments were not severe; substantial evidence supports the ALJ's determination that Plaintiff did not have an impairment of combination of impairments that met, medically equaled, or functionally equaled a Listing; and properly considered the medical expert's testimony.  Doc. 16.

### B. Summary of Evidence

Plaintiff was born on April 27, 2011, and tested positive for cocaine at birth.  Tr. at 549.  According to his grandmother, he was born addicted to numerous substances causing withdrawal symptoms such as tremors that improved in his early years.  Id. at 720, 784.  When he was eight months old, Plaintiff began treating with pulmonologist Michael S. Schwartz, M.D., for asthma symptoms that began when he was two or three months old.  Id. at 611.  Plaintiff had several episodes of asthma exacerbation in late 2011 and 2012, for which he was treated at Lehigh Valley Hospital.  Id. at 611 (noting

5

Emergency Room visits for asthma on 10/8/11 and 11/30/11), 529 (4/18-4/19/12), 559 (9/16/12), 577 (9/17-9/19/12). According to Stanley Stein, M.D., who conducted a pediatric disability examination on October 15, 2013, Plaintiff continued to suffer from asthma attacks about every two weeks that could be treated at home. Id. at 709. In 2015, he was treated with Singulair and Flovent.[8] Id. at 784. During a 2011-2012 period, Plaintiff also suffered from recurrent acute otitis media,[9] for which he had tubes surgically inserted in his ears on October 22, 2012. Id. at 595, 745.

Plaintiff also exhibited developmental and speech delays that have greatly improved during the relevant period. In June 2012, Plaintiff's primary care physician group referred to these as "[m]ild speech and gross/fine motor delay." Tr. at 664. During an evaluation for the Head Start program on August 9, 2012, Plaintiff's language skills were of concern, and the evaluator noted a history of torticollis[10] and feeding issues. Id. at 335. Kym DeFour, M.S. Ed., conducted a speech and language evaluation on November 17, 2013, and found that Plaintiff's language skills were a standard deviation below the mean and eight months below age expectations. Id. at 722.

---

[8]Singulair is a leukotriene inhibitor used to prevent asthma attacks. See https://www.drugs.com/singulair.html (last visited Jan. 23, 2020). Flovent is a corticosteroid used to prevent asthma attacks. See https://www.drugs.com/search.php?searchterm=Flovent (last visited Jan. 23, 2020).

[9]Otitis media is inflammation of the middle ear. Dorland's Illustrated Medical Dictionary, 32nd ed. (2012) ("DIMD"), at 1350.

[10]Torticolllis is "abnormal contraction of the muscles of the neck, producing twisting of the neck and an unnatural position of the head." DIMD at 1941.

Plaintiff began outpatient treatment at Pinebrook Family Answers in November 2014, when he was diagnosed with PDD.[11] Tr. at 736. In May 2015, Megan Gabel, M.A., noted an increase in Plaintiff's anger. Id. at 732.

In March 2015, Plaintiff began outpatient therapy and psychiatric services at KidsPeace for treatment of defiance, hyperactivity, and aggressive behavior. Tr. at 773. At that time, Ruth Housman, LPC, found Plaintiff hyperactive, his insight compromised, and his concentration poor. Id. at 775. His behaviors mirrored symptoms of ASD, and he was diagnosed with Adjustment Disorder NOS[12] and found to have a Global Assessment of Functioning ("GAF") score of 56.[13] Id. at 782, 856. Child psychiatrist

---

[11]PDD NOS (not otherwise specified) "is a severe and pervasive impairment in the development of reciprocal social interaction associated with impairment in either verbal or nonverbal communication skills or with the presence of stereotyped behavior, interests, and activities, but the criteria are not met for a specific Pervasive Developmental Disorder, Schizophrenia, Schizotypal Personality Disorder, or Avoidant Personality Disorder." Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000) ("DSM IV-TR"), at 84. The DSM was revised in 2013. In the DSM-5, PDD is included in the diagnosis of ASD. DSM-5 at 51. "The essential features of [ASD] are persistent impairment in reciprocal social communication and social interaction . . . , and restricted, repetitive patterns of behavior, interests or activities . . . ." Id. at 53.

[12]"The presence of emotional or behavioral symptoms in response to an identifiable stressor is the essential feature of adjustment disorders . . . ." DSM-5 at 287.

[13]A GAF score is a measurement of a person's overall psychological, social, and occupational functioning, and is used to assess mental health. DSM IV-TR at 34. A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Id. Although the DSM 5, eliminated reference to the GAF score, the Commissioner continues to receive and consider GAF scores in medical evidence, see Administrative Message-13066 (July 22, 2013), and an ALJ must consider a GAF score with all of the relevant evidence in the case file. Nixon v. Colvin, 190 F. Supp.3d 444, 447 (E.D. Pa. 2016).

David Behar, M.D., of KidsPeace, conducted a psychiatric evaluation on April 22, 2015 (signed on May 6, 2015), noting that Plaintiff was referred for severe impulsivity, risk of injury, and school complaints. Id. at 728, 730. He diagnosed Plaintiff with ADHD, ODD, and a mixed developmental learning disability, with a GAF of 40.[14] Id. at 729. These diagnoses were again assigned in June 2015. Id. at 852.

In November 2015, William LeBeouf, M.D., from KidsPeace, noted Plaintiff's history of significant delays in walking and talking, and continued language delays. Tr. at 783. Dr. LeBeouf diagnosed Plaintiff with ASD. Id. at 785. He noted that Dr. Behar had prescribed Vyvanse.[15] Id. at 784. His treatment plan included speech and occupational therapy, the addition of Elavil, and DDAVP for enuresis, and possibly a trial of Tenex.[16] Id. at 785. During an evaluation at KidsPeace on December 11, 2015,

---

[14]"The essential feature of [ADHD] is a persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning, or development. DSM-5 at 61. "The essential feature of [ODD] is a frequent and persistent pattern of angry/irritable mood, argumentative/defiant behavior, or vindictiveness . . . . " Id. at 463. A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV-TR at 34.

[15]Vyvanse is a central nervous system stimulant used to treat ADHD. See https://www.drugs.com/vyvanse.html (last visited Jan. 23, 2020).

[16]Elavil is an antidepressant. See https://www.drugs.com/search.php?searchterm=elavil (last visited Jan. 23, 2020). DDAVP is a man-made form of a hormone used to treat diabetes insipidus, and increased thirst and urination caused by head surgery or trauma. See https://www.drugs.com/mtm/ddavp-nasal.html (last visited Jan. 23, 2020). Enuresis is urinary incontinence. DIMD at 628. Tenex reduces nerve impulses in the heart and blood vessels and is used to treat high blood pressure and ADHD. See https://www.drugs.com/mtm/tenex.html (last visited Jan. 23, 2020).

psychologist Elizabeth Rozette Nguyen noted Plaintiff's speech delay, indicating that he was difficult to understand and exhibited some echolalia.[17] Id. at 749. The psychologist found that Plaintiff suffered from social and emotional delays and hyperactive restlessness. Id. at 752. She indicated that Plaintiff is hyperactive, inattentive, oppositional and defiant, and meets the criteria for ASD. Id. at 752-53. "Psychtropic medications were tried and had little effectiveness and made the child more hyperactive." Id. at 753.

The KidsPeace February 9, 2016 Treatment Plan indicates that Plaintiff was diagnosed with ASD, "level 3 requiring very substantial support," ADHD, and ODD, as well as enuresis. Tr. at 837. Speech and occupational therapy were recommended. Id. at 845. The treatment plan identified four problems; deficits in receptive and expressive communication, struggles with social interaction and play skills with peers, lacking compliance with adult directives and coping skills, and his sister's struggle to understand his special needs. Id. at 837. The treatment plan was reviewed in September 2016, id. at 828, at which time, Plaintiff's goals with communication had to be revisited because "they were too advanced for where [he] is verbally." Id. at 830. With social interaction, Plaintiff made progress with taking turns but struggled with winning and losing. Id. at 831. Plaintiff's coping skills remained problematic "as he will just get up and walk away from a task if he doesn't want to do it or if it is too difficult." Id. at 833. During this

---

[17]Echolalia is "stereotyped repetition of another person's words or phrases." DIMD at 589.

9

time, however, Plaintiff's sister was doing much better understanding his special needs. Id. at 834.

The Individualized Education Programs ("IEPs") included in the record corroborate the limitations and difficulties noted in Plaintiff's medical records, but also indicate improvement more recently. Plaintiff's language and communication issues, as well as his socialization issues related to tantrums and biting, were present in 2013. Tr. at 336, 795. In March 2016, his language and communication skills were age appropriate and there were no concerns noted in his personal and social skills or gross or fine manipulation. Id. at 801-03. However, his articulation skills were still considered delayed, id. at 801, 813, and in March 2017, when Plaintiff was five years old, the reviewer noted that Plaintiff's "articulation skills remain[ed] delayed and intervention [was] recommended." Id. at 420.[18]

At the second administrative hearing, Alan Meyers, M.D., a medical expert who had reviewed Plaintiff's records, testified that he had reviewed the Listings related to autism, communication disorders, personality, impulse control disorder and neurodevelopmental disorders, and that Plaintiff did not meet any of these Listings. Tr. at 109. However, Dr. Meyers found that Plaintiff had marked limitations in two of the domains of functioning – maintaining and completing tasks and physical well-being. Id.

---

[18]The record also contains evidence post-dating the ALJ's decision. Tr. at 11-77. In determining whether the ALJ's decision is supported by substantial evidence, this court may not consider evidence that was not before the ALJ. See Matthews v. Apfel, 239 F.3d 589, 594 (3d Cir. 2001) ("[f]or purposes of judicial review, the 'record' is 'the evidence upon which the findings and decision complained of are based").

at 114.  In addition, Dr. Meyers explained that he categorized Plaintiff's limitation in interacting and relating to others as between marked and less than marked because Plaintiff "has an occasionally marked problem, sometimes less than marked." Id. at 114-15.

### C. Consideration of Plaintiff's Claims

Plaintiff presents the court with three claims challenging (1) the ALJ's consideration of the testimony of the medical expert, (2) his determination that only two of Plaintiff's impairments were severe, and (3) his analysis of whether Plaintiff's impairments met, medically equaled, or functionally equaled any of the relevant Listings. Doc. 11.  Defendant responds that the ALJ properly considered all of the evidence and his decision is supported by substantial evidence.  Doc. 16.

After carefully reviewing the record and the ALJ's decision, I conclude that there is a fundamental flaw with the ALJ's consideration of the evidence which pervades his determination regarding the severity of Plaintiff's impairments and whether Plaintiff's impairments met, medically equaled, or functionally equaled any of the relevant Listings. Although the ALJ found Plaintiff's ADHD and ASD to be severe, he found that Plaintiff's asthma, recurrent otitis media, speech delay, and ODD were not severe. Specifically the ALJ stated, "these impairments have improved and no longer cause more than minimal limitations for [Plaintiff]." Tr. at 84.  Thus, the ALJ implies that these impairments did, at some point during the relevant period, cause more than minimal limitations for Plaintiff and thus were severe.  Yet, the ALJ failed to evaluate whether these impairments, combined with Plaintiff's ADHD and ASD, rendered him disabled for

any twelve-month period during the relevant time.  See 20 C.F.R. §§ 416.906 (definition of disability for children includes twelve-month durational requirement); 416.924(d)(2) (impairment must meet the durational requirement); 416.909 (impairment must have lasted or is expected to last for a continuous period of at least twelve months).[19]  In response to Plaintiff's motion, Defendant argues that "because the ALJ found at least one severe impairment at step two, finding in [Plaintiff's] favor, he properly continued with the sequential evaluation process."  Doc. 16 at 5.  Although the ALJ did continue with the evaluation, he never considered the limitations imposed by Plaintiff's medical impairments (asthma and recurrent ear infections), speech delay, or ODD before their improvement.  The ALJ relied on more recent evidence indicating that Plaintiff's asthma was well controlled, see tr. at 84-85 (citing id. at 757), and that his speech had improved, id. at 85 (citing id. at 471),[20] but the ALJ neglected to determine if the impairments he found non-severe along with those he found severe, met or medically or functionally equaled the Listings at any point during the relevant period.  Rather, the ALJ stated that "[g]iven [Plaintiff's] medical improvement, behavioral development, as well as his progress with speech, the undersigned concludes the above impairments are non-severe."

---

[19]Plaintiff mentioned but did not develop this argument in his opening brief.  See Doc. 11 at 5 ("full spectrum of behaviors for the entire period has not been fully considered"), 8 ("ALJ should have evaluated the evidence for the entire relevant period").  He articulated the argument more clearly at the end of his Reply Brief.  Doc. 17 at 7-8.

[20]I note that the IEP relied upon by the ALJ to support his finding that Plaintiff's speech had improved also states that "[Plaintiff's] intelligibility decreases in connected speech," that his "language skills remain delayed and intervention is recommended" and his "articulation skills remain delayed and intervention is recommended."  Tr. at 471.

12

Id. at 85. This is problematic because there was never an assessment of Plaintiff's impairments before the improvement of those conditions that the ALJ found not severe. Thus, I will remand the case for further consideration of the evidence, specifically for consideration of whether Plaintiff's impairments met or medically or functionally equaled the Listings for any twelve-month period during the relevant period.

The ALJ's consideration of the medical expert's testimony warrants additional discussion and highlights the impact of his error. Plaintiff argues that the ALJ failed to properly consider the testimony offered by Dr. Meyers, including by failing to cite competing evidence to support his rejection of the doctor's opinions. Doc. 11 at 27-31. Defendant responds that the ALJ properly considered the medical expert's opinion and properly did not accept it because it was inconsistent with the evidence of record. Doc. 16 at 9.

An ALJ does not have to accept the testimony of a medical expert, but has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009). When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as he does not "reject evidence for no reason or for the wrong reason." E.g., Brown v. Astrue, 649 F.3d 193, 196-97 (3d Cir. 2011) (citations omitted); Rutherford v. Barnhart, 399 F.3d 399 F.3d 546, 554 (3d Cir. 2005); Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1991).

The Appeals Council remanded following the ALJ's first decision for a number of reasons, including to obtain updated evidence on Plaintiff's medical condition and, if

necessary and available, obtain evidence from a medical expert "to clarify the nature and severity of [Plaintiff's] impairments and whether the [Plaintiff's] impairments meet or equal the severity of an impairment [in the Listings]." Tr. at 187-88. As previously mentioned, Dr. Meyers testified at the second administrative hearing that Plaintiff did not meet any of the relevant Listings. Id. at 109. However, with respect to functional equivalence, he found that Plaintiff had marked limitations in two domains of functioning (and fell between less than marked and marked in a third), thus opining that Plaintiff met the test for disability. Id. at 115.

The ALJ gave partial weight to Dr. Meyers' opinions.

> The undersigned also considered the medical opinion included in the hearing testimony of medical expert, Dr. Alan Meyers. Dr. Meyers testified he had reviewed all medical and educational evidence in the record. He reported [Plaintiff] suffered from asthma, which was severe from 2011 through 2013, but has improved in the last several years; he was born addicted to substances; he had recurrent ear infections, leading to surgery which solved the problem; speech problem resulting in delay; ADHD; and ASD, moderate to severe, treated medically with Tenex. He testified he had considered all appropriate listings, but he found [Plaintiff's] impairments did not meet the severity of any listing. He noted he had considered all evidence, and the records indicate [Plaintiff] was functioning in the average or slightly below average levels in cognitive or academic achievement. Therefore, he concluded [Plaintiff] had less than marked limitations in "paragraph B" functional areas.[21] With respect to the functional domains, Dr. Meyers concluded [Plaintiff] had the following limitations: (a) less than marked limitations in acquiring and using information; (b) marked limitations in attending and completing tasks due to ADHD; (c) occasionally marked, sometimes less than

---

[21]As will be discussed, infra at 16, the B criteria of the childhood mental health Listings require a claimant to show certain limitations in one or more of four areas.

14

> marked limitations in interacting and relating with others; (d)
> no limitation in moving about and manipulating objects; (e)
> less than marked limitations in caring for self; and (f) marked
> limitations in health and physical well-being in considering
> the combination of asthma, ear infections, bed-we[tt]ing, and
> mental health impairments. This opinion is given partial
> weight. The undersigned agrees the severity of [Plaintiff's]
> impairments does not meet any listing, as supported by
> educational and psychological records. As to the functional
> domains, the undersigned concludes Dr. Meyers' opinion
> overestimates [Plaintiff's] limitations. Dr. Meyers'[ ]
> opinions on the functional domains are inconsistent with his
> conclusions upon discussing the listings. The undersigned
> agrees the records support achievements in cognitive and
> academic functioning in the average or slightly below average
> range. Further, the records support improvement in behavior
> and impairments during the alleged disability period. Given
> [Plaintiff's] placement in a regular classroom with less than
> 20% of the day removed for learning support, the undersigned
> agrees [Plaintiff] has no limitation in moving about and
> manipulating objects; however, he has less than marked
> limitations in all other functional domains.

Tr. at 89-90 (record citations omitted).

The two domains in which Dr. Meyers found Plaintiff had marked limitation are maintaining and completing tasks and physical well-being. Tr. at 114. The ALJ rejected the doctor's opinions as to these domains because they were inconsistent with Dr. Meyers' findings with respect to the relevant Listings, and because the records did not support such limitations.

The ALJ's concern that Dr. Meyers' opinion was internally inconsistent is understandable. At the administrative hearing, Dr. Meyers stated that Plaintiff's impairments did not meet any of the relevant Listings and specifically discussed Listing 112.10 (ASD), which requires that the Plaintiff meet the criteria for both the A and B

15

criteria of the Listing.[22] With respect to the B criteria, the Plaintiff must establish extreme limitations in one or marked limitations in two areas of mental functioning; (1) understand, remember, or apply information, (2) interact with others, (3) concentrate, persist, or maintain pace, and (4) adapt or manage oneself.[23] 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.10(B)(1)-(4). Dr. Meyers stated that, although he believed Plaintiff had problems in these areas, he thought they were less than marked. Tr. at 110. This creates some confusion because at the same time Dr. Meyers found less than marked limitations in Plaintiff's ability to concentrate, persist, or maintain pace, he also found Plaintiff had marked limitation in the functional domain of attending and completing tasks. There is tremendous overlap in these two categories. Compare 20 C.F.R. § 916.926a(h) (defining the domain of attending and completing tasks to include "how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them") with 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.00(E)(3) (defining concentrate, persist, or maintain pace of the B criteria to include "the ability to focus attention on activities and stay on task age-appropriately"); see also S.T. by Taylor v. Berryhill, Civ. No. 16-717, 2017 WL 6945185, at *11 n.13 (E.D. Va. Dec. 21, 2017) (noting similarities between the domain of attending and completing tasks and the B

---

[22]The A criteria of the Listing are not relevant to this discussion.

[23]The same B criteria apply to each of the childhood mental health Listings, except for 112.05 (intellectual disorders). See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(A)(2)(b).

16

criteria of concentrate, persist, or maintain pace). However, the ALJ had the opportunity to seek clarification from Dr. Meyers on this point and failed to do so.

Moreover, the ALJ's consideration of Dr. Meyers' opinions with respect to the domains of attending and completing tasks and physical well-being suffers the same flaw as previously discussed. The ALJ relied on "improvement in behavior and impairments during the alleged disability period" to minimize reliance on Dr. Meyers' conclusions. Tr. at 90. Additionally, in his discussion of these two domains, the ALJ relied on Plaintiff's progress and a more recent IEP, overlooking the periods when the evidence establishes that his impairments imposed greater limitations. Id. at 93 (citing id. at 755-61, 828-59) (addressing the domain of attending and completing tasks); 97 (addressing the domain of health and physical well-being, noting resolution of the recurrent ear infections, improvement in his asthma and enuresis). It was incumbent upon the ALJ to review the record throughout the claimed disability period and determine whether Plaintiff's impairments met, medically equaled, or functionally equaled the Listings for any twelve-month period during the claimed disability period.

In addition, the ALJ gave partial weight to the opinions of the medical and psychological consultants who reviewed the file at the initial determination stage in November and December 2013. Tr. at 89. This is problematic because this review took place prior to Plaintiff's ADHD and ASD diagnoses, and it also contravened the Appeals Council's remand order, which directed the ALJ to update the evidence.

## IV. <u>CONCLUSION</u>

The ALJ's decision is flawed because he relied on improvement in many of Plaintiff's conditions in determining which impairments were severe and whether Plaintiff's impairments met, medically equaled or functionally equaled the Listings. On remand, the ALJ shall review the record in its entirety and determine if, during any twelve-month period, Plaintiff's impairments met, medically equaled, or functionally equaled the Listings, considering among other things, whether Plaintiff is entitled to a closed period of benefits. In addition, the ALJ shall reconsider the medical expert's testimony in light of all the evidence, not just the most recent records and IEPs evidencing medical and behavioral improvement, and seek clarification of the medical expert's opinions, if necessary.

An appropriate Order follows.